

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| LESLIE CARTER, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 11-7187 |
| WEST CHESTER UNIVERSITY, | : | |
| Defendant. | : | |

FILED
APR 23 2014
MICH____Z, Clerk
By____Dep. Clerk

**MEMORANDUM**

TUCKER, C.J.                                                      April _____, 2014

Presently before the Court are Defendant West Chester University's unopposed Motion for Summary Judgment (Doc. 10) and Defendant West Chester University's unopposed Statement of Undisputed Material Facts (Doc. 11). Upon consideration of the motions with exhibits, and for the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED.**

**I.  FACTS AND PROCEDURAL BACKGROUND**[1]

Because the Court writes primarily for the parties, the Court sets forth only those facts that are relevant to its conclusion. Plaintiff Leslie Carter ("Carter"), an African-American male, began working as a Custodial Worker for Defendant West Chester University ("WCU") around March 29, 2007. (Def.'s Statement of Facts ¶ 1; Carter Dep. 26:15-27:14.) Carter was hired to work on Monday to Friday nights, from 10:00pm to 6:00am. (Def.'s Statement of Facts at ¶ 2; Carter Dep. 28:17-29:2.) His job duties included sweeping and waxing floors, cleaning

ENTERED
APR 2 3 2014
CLERK OF COURT

---

[1] The Defendant West Chester University has submitted a Statement of the Facts (Doc. 11) which the Plaintiff has not disputed. The facts described herein are undisputed though references to deposition testimony are made when possible.

classrooms, emptying trash, cleaning bathrooms, and occasionally shoveling snow from walkways. (Def.'s Statement of Facts at ¶ 3; Carter Dep. 32:16-33:13.)

When Carter was hired he was given a written copy of WCU's leave of absence and call-out policy. (Def.'s Statement of Facts at ¶ 4; Carter Dep. 52:11-55:23; Ex. B.) This policy stated that early leave from the work day required approval by a supervisor. (Def.'s Statement of Facts at ¶ 5; Carter Dep. 47:4-17; Ex. B.) Absences from work required an employee to utilize WCU's call-out procedure by calling a designated telephone number two hours before the start of the scheduled work day and leaving a message. (Def.'s Statement of Facts at ¶ 6-7; Carter Dep. 47:18-48:4; 53:9-54:7; Ex. B.) Once an employee returned to work from an absence, it was necessary to submit a leave slip. (Def.'s Statement of Facts at ¶ 8; Carter Dep. 55:13-23.) An absence of three or more days required the employee to submit a doctor's note. (Def.'s Statement of Facts at ¶ 9; Carter Dep. 53:9-54:10.) WCU also required annual, personal, or compensatory leave to be requested, approved, and scheduled ahead of time. (Def.'s Statement of Facts at ¶ 10; Carter Dep. 52:16-53:8.)

On March 20, 2008, following a Pre-Disciplinary Conference ("PDC") conducted by WCU with Carter in attendance, Carter received a written warning because, as WCU describes, he failed to appear for work or notify his supervisors of his intended absences. (Def.'s Statement of Facts at ¶ 11-14; Ex. C.) He was also reprimanded for leaving work early on another occasion without supervisor permission. (Def.'s Statement of Facts at ¶ 11-14; Ex. C.) On March 23, 2009, following another PDC with Carter in attendance, WCU suspended Carter for one day without pay for not appearing for work or following the call-out procedure in March of 2009. (Def.'s Statement of Facts at ¶ 15-16; Ex. D.) The letter informing Carter of his suspension also put Carter on notice that continued problems of a similar nature would result in more significant

2

disciplinary action. (Def.'s Statement of Facts at ¶ 17; Carter Dep. 110:3-8; Ex. D.) On May 4, 2009, Carter received another written notice in lieu of suspension without pay for taking "unauthorized break[s]" in faculty areas. (Def.'s Statement of Facts at ¶ 18; Carter Dep. 110:21-111:3; Ex. E.) On July 1, 2009, WCU terminated Carter following another PDC with Carter in attendance. (Def.'s Statement of Facts at ¶ 19; Ex. F.) The letter cited incomplete work assignments and claims that Carter addressed a co-worker in "a threatening manner" during a disagreement. (Def.'s Statement of Facts at ¶ 19; Ex. F.) Following this termination, on July 9, 2009, a grievance was filed on behalf of Carter by union representative Beth Cooper ("Ms. Cooper"), stating that Carter was fired without just cause. (Def.'s Statement of Facts at ¶ 20; Ex. G.) In response to this grievance and in settlement with Carter's union, Carter signed a settlement agreement from WCU, reinstating Carter to his former position effective December 7, 2009. (Def.'s Statement of Facts at ¶ 19-21; Ex. H.) The agreement that Carter signed detailed that he was placed on "Final Warning for Performance and Conduct" for a period of two years following his reinstatement, under which any further incidents could result in termination. (Def.'s Statement of Facts at ¶ 19-22; Carter's Dep. 124:16-45; Ex. H.) Finally, on March 17, 2010, following another PDC with Carter, WCU terminated Carter for excessive absences and failure to follow call-out procedures. (Def.'s Statement of Facts at ¶ 24; Ex. I.)

On November 17, 2011, Carter filed the instant Pro Se Complaint with the Eastern District of Pennsylvania for racial discrimination and hostile work environment in violation of Title VII.[2] This claim is based on Carter's termination from WCU in March of 2010. After a

---

[2] Carter did not expressly state in his Complaint that he was bringing a claim for "[f]ailure to stop harassment" but his statements describing episodes of "harassment by non Black co workers (sic) and upper management," along with further testimony, provide the basis from which this Court reads a hostile work environment claim under Title VII. (Compl. at p. 8; Carter's Dep. 63:13-71:6; 98:3-5.) *See e.g., Higgs v. Atty. Gen of the U.S.*, 655 F.3d 333, 339 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) ("The obligation to liberally construe a *pro se* litigant's pleadings is well-established.")

period of discovery, WCU submitted the instant Motion for Summary Judgment, which includes the deposition testimony of Carter. WCU's motion was not opposed or challenged by Carter. The motion contends that there is no legally sufficient basis to support Carter's claim of a hostile work environment or his contention that his termination was racially motivated, and thus a Title VII violation. The Court's analysis follows.

## II. STANDARD OF REVIEW

Summary judgment is awarded only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a);

---

In his Complaint, Carter also stated a claim for "retaliation" yet seemed to be mistaken as to the meaning of the word "retaliation" in the context of Title VII claims. Carter admits that he performed no protected action under Title VII—a requirement for retaliation claims under that law—and that WCU's "retaliation" simply amounted to a critique of Carter's job performance. *See Moore v. City of Philadelphia*, 461 F.3d 331, 340-42 (3d Cir. 2006) (describing the elements of a prima facie retaliation case under Title VII). Specifically, Carter testified as follows:

> **Q: All right. Now, we went through the termination claim. What is the retaliation claim that you are alleging? Because you checked off retaliation, so what's the retaliation aspect?**
> A: Just getting back to the way they were treating me. That's why I checked that off.
> **Q: You're saying to get back at them for the way they treated you?**
> A: The way they treated me and the way they was treating me when I was working for them.
> **Q: So, the retaliation is for the way they treated you? Was there something specific that they did that was retaliatory?**
> A: I think just hollering at me and just – let me say, just harassing me, it's not even necessary, just picking and picking.
> . . .
> **Q: And what kinds of things were they picking on you about?**
> A: Well, I might have cleaned the bathroom real spotless and I would come back in and they tell me, well, this ain't right, you got to wipe this, wipe this. Just nonsense. You got to do this and do this, when it's already clean.
> **Q: Was there anything specific that they did that was, would you say, in retaliation for anything that happened?**
> A: I can't recall.
> **Q: Any action that they took against you for anything in particular?**
> A: Not no physical action, nothing like that.
> **Q: It doesn't have to be physical. Is there any specific action that they took?**
> A: Just verbal, that's all.
> **Q: Just verbal?**
> A: That's all. Verbal, yes. I'll say verbal. And when I was working for them, just keep riding my back, making the paper trail, like the more paper they got on me, the better off they have a better chance of getting rid of you. So, I will say a paper trail. They build the paper trail too much and you ain't going to get it.
> **Q: Other than this lawsuit, have you filed any other claims or lawsuits related to this action?**
> A: Not that I recall, no.

(Carter Dep. 97:14-98:5; 98:10-99:13.)

4

*Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson*, 477 U.S. at 248; *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 327 (1986). Once the moving party has carried its burden under Rule 56, "its' opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249 (citations omitted); *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Communications, Inc.*, 258 F.3d 132 (3d Cir. 2001). The court must award summary judgment on all claims unless the non-moving party shows through affidavits or admissible evidence that an issue of material fact remains. *See, e.g., Love v. Rancocas Hosp.*, 270 F.Supp.2d

576, 579 (D.N.J. 2003); *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 205 F.Supp.2d 324, 330 (D.N.J. 2002).

### III. DISCUSSION

#### A. Carter's Claim of a Hostile Work Environment under Title VII

##### *1. Carter has Failed to Establish a Prima Facie Case of a Hostile Work Environment*

Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A party may demonstrate that a violation of Title VII has occurred by proving that racial harassment created a hostile or abusive environment in the workplace. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). To succeed on a hostile work environment claim, the plaintiff must establish that: "(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Caver v. City of Trenton*, 420 F.3d 245, 262 (3d Cir. 2005) (citing *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001)); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996). The Supreme Court has emphasized that "whether an environment is "hostile" or "abusive" can be determined only by looking at the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Additionally, the Supreme Court has laid down specific requirements to prevent Title VII from becoming a "general civility code."

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). "The Supreme Court has stated that Title VII is not violated by the 'mere utterance of an . . . epithet which engenders offensive feelings in an employee' or by mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment." *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 280 (3d Cir. 2001) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 787-88 (1998)) (internal quotations and citations omitted). "'[S]imple teasing,'" offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S at 788; *Abramson*, 260 F.3d at 280; *also see Saxe v. State College Area School Dist.*, 240 F.3d 200, 206 (3d Cir. 2001).

Under these requirements, Carter fails to present any evidence that suggests a genuine issue of material fact exists regarding whether WCU's treatment of him was sufficiently severe or pervasive to violate Title VII. Carter's contentions of unfair treatment by WCU come in two forms: what he calls "harassment" by WCU supervisors and representatives and inappropriate comments by WCU staff members. The "harassment" Carter allegedly suffered was not racially based, however, and instead amounts to Carter's discomfort with both African-American and non-African-American supervisors critiquing his job performance and making a written record of their dissatisfaction with Carter's behavior. (Carter Dep. 63:13-71:6; 98:3-99:13.)

Carter testified that it was "harassment" and "lying" when WCU representatives reprimanded him for "not doing [his] work."[3] (Carter Dep. 68:5-17.) Carter also notes that the

---

[3] Specifically, Carter testified as follows:

> **Q: But what would the non-black co-workers do to harass you?**
> A: They say I'm not doing my work. I just wanted to --
> **Q: So, they would say you're not doing your work?**
> A: Yeah, but I was.
> **Q: Is that the harassment you are talking about?**

7

level of scrutiny of his work and absences could have been brought upon by the fact that he, solely among his colleagues, argued with his supervisors when they critiqued his lateness or his job performance at all. (Carter Dep. 76:6-78:5.) Further, Carter puts forward as evidence supervisor Ed MacDonald's ("Mr. MacDonald") use of the phrases "you got to crack the whip" and "your ass ain't moving fast enough," phrases Carter describes as "racial slurs." (Carter Dep. 37:19-38:23.) Carter further testified that he had an audio recording of these statements but subsequently lost the recording. (Carter Dep. 38:7-14.) Carter also maintained that his co-workers Mike and Juanita heard Mr. MacDonald's slurs, but Carter has failed to provide either of their testimonies to the Court. (Id.) Carter testified that he complained of Mr. MacDonald's behavior to WCU's human resources department but was rebuffed by a human resources official named Trish Seningen ("Ms. Seningen"), who told Carter at one point to "sit [his] black ass down." (Carter Dep. 39:24-40:22.) Finally, Carter notes that his union representative, Ms. Cooper, "didn't care too much for blacks" based on information Carter "hear[d] from the grapevine." (Carter Dep. 66:14-67:9.)

Assuming these allegations to be true, the Court finds that, without more, such scant evidence of singular incidents, speculation, and commentary is not enough to establish a prima facie case of a hostile work environment under Title VII. In order to establish a prima facie case, the incidents complained of must be so severe or pervasive that they change the conditions of employment. *Abramson*, 260 F.3d at 280. Carter's provides only his testimony as evidence without any supporting documentation. Moreover, none of the treatment Carter claimed to suffer at the hands of WCU was pervasive or severe enough to warrant protection under Title VII.

---

A: That's harassment, that's lying. That's why I would leave my job and go to my other job. I was supposed to get off there at 6:30, I might leave at 5:00 because I couldn't put up with it.

(Carter Dep. 68:5-17.)

8

Carter's general complaints of harassment mostly comprise of activities which may be annoying to the ordinary worker but are permissible under Title VII. WCU representatives may, under Title VII, discuss poor job performance or lateness with its own employees without that discussion itself providing the basis for a harassment claim. Additionally, none of the inappropriate comments about race by WCU representatives constitute the kind of severe or pervasive behavior required to make an environment hostile enough to alter the conditions of employment. Carter's claims against Ms. Cooper are based on pure rumor, while Ms. Seningen uttered her remark on only one occasion. The Supreme Court has spoken against turning Title VII into a civility code and has ruled that off-hand comments such as Ms. Seningen's cannot establish a case under Title VII. *See Oncale v.* 523 U.S. at 81; *Faragher*, 524 U.S at 788. Mr. Macdonald's comments, while more frequent, were facially race-neutral, ambiguous, and of insufficiently severity to constitute an objective change in Carter's work conditions. As such, Carter's evidence against WCU fails to meet the threshold necessary to establish a prima facie case of a hostile work environment under Title VII.

### B. Carter's Claim of Racial Discrimination Under Title VII

#### *1. Carter has Failed to Establish a Prima Facie Case of Racial Discrimination*

Claims brought under Title VII are analyzed under the burden-shifting framework first announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-4 (1973). *See e.g., Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citations omitted). Under the *McDonnell* framework, a plaintiff alleging workplace discrimination bears an initial burden of establishing a prima facie case of race discrimination. *Makky*, 541 F.3d at 214 (citations omitted). To establish this prima facie case under Title VII, the plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4)

9

the circumstances of the adverse employment action could give rise to an inference of intentional discrimination. *Id.*

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to provide evidence of a non-discriminatory reason for the adverse employment action. *Id.* This burden is "relatively light" and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citations omitted). Once this burden is met, the plaintiff then must demonstrate that the defendant's reason for the adverse employment decision was simply a pretext for discrimination. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

To make a showing of pretext the plaintiff must satisfy the test pronounced in *Fuentes v. Perskie*, by which, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). This must be done by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 277 (3d Cir. 2010) (citing *Fuentes*, 32 F.3d at 765) (internal quotation marks and citations omitted) (emphasis in original).

The first three elements of the prima facie test are not in dispute in this case. However, with respect to the fourth element, WCU argues that Carter has not met his burden of showing a prima facie case of racial discrimination because he has not produced any evidence of circumstances that would give rise to an inference of discriminatory action. (Def.'s Mot. Summ. J. at 2-3.)

WCU states that Carter fails to provide evidence of similarly situated employees who were treated differently than Carter. WCU defines "similarly situated employees" as those who signed an agreement that put them on "Final Warning" and then continued to have numerous unscheduled absences after they made such an agreement. (Id.) Carter does not deny these charges. He also provides no comparator evidence in response to WCU's claims and admits that he was absent without permission a number of times after he signed the settlement agreement with WCU and was given a "Final Warning." (Carter Dep. 131:10-132:24.) Of the eighteen unauthorized absences noted on WCU's March 17, 2010 termination letter, Carter's only counterargument is that he requested leave for "a majority" of them and further states that he could not remember making written requests for any of them. (Id.)

In addition to a lack of evidence showing non-African Americans who violated WCU's absence and call-out policies after signing an agreement putting them on "Final Warning," Carter provides no comparator evidence at all. Carter testified he understood that WCU's policies demanded review and approval by supervisors for absences and early departures (Carter Dep. 52:11-56:2), yet Carter repeatedly admitted to leaving work early without permission or otherwise not complying with WCU's leave of absence or call-out policy. (Carter Dep. 37:3-18; 68:5-69:6.)

Additionally, on March 20, 2008, WCU sent Carter a written warning concerning unauthorized absences on March 3, 2008 and March 13, 2008. (Def.'s Statement of Facts at ¶ 11; Ex. C.) Carter was also warned for leaving work early on March 5, 2008. (Ex. C.) Carter admitted the March 3rd and 13th absences and further conceded that at his PDC on March 17, 2008, he was not able to call in either absence because his cell phone did not have airtime minutes available. (Id.; Carter Dep. 100:2-102:19.) Carter also admitted that out of frustration he often leaves work early without permission and that as a result of his frustration it is possible he left early on March 5, 2008 as well. (Carter Dep. 103:8-104:4.) WCU advised Carter that further infractions would lead to additional disciplinary action. (Ex. C.)

On March 23, 2009, following a PDC with Carter, WCU suspended Carter for one day without pay for not appearing for work on March 3, 2009 and failing to follow the call-out procedure on the day in question. (Ex. D.) Carter admitted to not appearing for work but argued that he was not able to leave a message on WCU's call-out system because the message system was full and could no longer receive messages. (Carter Dep. 107:4-108:24.) Carter further testified that he did not have access to a computer or electronic mail, could not place a text message to any supervisor or company line, and also lacked the contact information for any of his supervisors. (Carter Dep. 102:4-103:2; 108:25-109:20.) At that point, WCU again put Carter on notice that further problems could lead to disciplinary action. (Def.'s Statement of Facts at ¶ 17; Carter Dep. 110:3-8; Ex. D.)

Carter does deny taking unauthorized breaks in faculty lounges in April of 2009 (Carter Dep. 110:20-112:5) and threatening a co-worker on June 21, 2009 (Carter Dep. 115:24-117:17), actions for which WCU terminated Carter effective July 1, 2009. (Ex. F.) Following these events, however, Carter was re-hired by WCU and issued a "Final Warning." (Ex. H.) He was

terminated again after eighteen additional unscheduled absences or early departures between January 7, 2010 and March 12, 2010, all of which Carter has admitted to taking and some of which he has admitted to taking without permission. (Carter Dep. 131:10-132:24; Ex. I.)

Carter provides the Court with no evidence specifically comparing himself to any other WCU employee outside of his protected class. Rather, Carter notes two other African-American employees that were fired by WCU but testified that he does not know why they were terminated. (Carter Dep. 48:10-51:7.)

Though comparator evidence is not the only type of evidence that a party may use to establish that a genuine issue of material fact exists for the factfinder, Carter fails to present sufficient evidence of any kind to link his termination to racial animus on the part of WCU. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *Golod v. Bank of America*, 403 Fed.Appx. 699, 703 n.2 (3d Cir. 2010) (citations omitted). As discussed above, Carter lists some of instances of rude and inappropriate behavior by one of his supervisors and a WCU human resources official, though these minor comments fail, by themselves, to create a situation from which a reasonable factfinder could possibly find a connection between Carter's termination and impermissible racial animus on WCU's part.

Moreover, even if Carter had been able to establish a prima facie case of racial discrimination under Title VII, he fails to present sufficient evidence to suggest WCU's reasons for termination are pretextual. *Fuentes* requires the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Here, Carter provides scant evidence from which a reasonable factfinder could find a

genuine issue of material fact remains. Carter admits to being absent or late and failing to notify WCU as required by WCU policy on March 3rd and 13th of 2008, prior to his original warning, and on March 3, 2009, prior to his second warning. (Carter Dep. 100:2-102:19; 107:4-108:24.) Finally, Carter admits to only requesting leave for a "majority" of his eighteen absences or early departures after he had signed a settlement agreement with WCU putting him on "Final Warning." (Carter Dep. 131:10-132:24.) In addition to admitting that he committed many of the policy violations that WCU claims, Carter provides insufficient evidence from which a reasonable factfinder could disbelieve the WCU's statements that he does challenge and further provides no evidence that their proffered reasons were more likely than not motivated by impermissible animus. Carter therefore fails to present evidence necessary in order to establish his racial discrimination claim under Title VII.

### IV.   CONCLUSION

For the foregoing reasons, Defendant WCU's Motion for Summary Judgment will be granted.

